GEORGE W. GUILD *et al.*

*v.*

TAYLOR S. WARNE *et al.*

*Filed at Ottawa November 29, 1893.*

1. WITNESS—*competency of party in suit as heir or devisee.* On bill filed by the children of a grantor of lands to set aside their father's conveyances to a grandson, one of the complainants, being also a party in interest, will not be a competent witness in his own behalf or for his co-complainants. And if one of such complainants dies, and his heirs are made parties complainant, they will also be incompetent, as well as their wives.

2. MENTAL CAPACITY—*to make a valid disposition of property.* On a bill by the heirs of a deceased grantor, to set aside deeds on the ground that the grantor was incapable of making a valid disposition of his property, the burden of proof will rest on the complainants to prove the allegations of their bill. They must show such a degree of mental weakness as to render the grantor incapable of understanding and protecting his own interests.

3. The mere circumstance that the mental powers of a person have been somewhat impaired by age or disease is not sufficient, if he still retains a full comprehension of the meaning, design and effect of his acts, unless, by undue influence of the grantee, he was unable to exercise his will in that respect.

4. NEW TRIAL—*on the evidence.* It is not accurate to say, without qualification, that appellate courts will not reverse the judgments of trial courts where the evidence of the successful party, considered by itself, without contravening evidence, is clearly sufficient to sustain the verdict. Language to that effect is only properly used, if at all, when the evidence is conflicting and would justify a finding either way.

5. CHANCERY—*weight to be attached to the findings of jury and the court.* Where witnesses testify orally on the trial of an issue of fact in a chancery suit, this court will not ignore the rule that a presumption must be indulged in favor of the decree which can only be overcome by evidence from which this court can say it is clearly wrong.

APPEAL from the Circuit Court of Kane county; the Hon. HENRY B. WILLIS, Judge, presiding.

Mr. CHARLES WHEATON, and Messrs. BOTSFORD & WAYNE, for the appellants:

The mental derangement or imbecility which will render a contract voidable must be such that the party is incapable of understanding or comprehending the nature and effect of his act when he entered into it. *Baldwin* v. *Dunton,* 40 Ill. 188; *Sheldon* v. *Harding,* 44 Ill. 68.

That the mental faculties have been somwhat impaired by age is not sufficient to invalidate a deed. *Wiley* v. *Ewalt,* 66 Ill. 26; *Lindsey* v. *Lindsey,* 50 id. 79; *Clearwater* v. *Kimler,* 43 id. 272; *Trish* v. *Newell,* 62 id. 196; *Meeker* v. *Meeker,* 75 id. 260; *Willemin* v. *Dunn,* 93 id. 511; *Pickerell* v. *Morss,* 97 id. 220; *English* v. *Porter,* 109 id. 285; *Kimball* v. *Cuddy,* 117 id. 213; *Burley* v. *McGough,* 115 id. 11; *Schneider* v. *Manning,* 121 id. 376; *Van Alst* v. *Hunter,* 5 Johns. Ch. 148.

The wife can not testify if the husband is interested. *Pyle* v. *Oustatt,* 92 Ill. 209; *Crane* v. *Crane,* 81 id. 165; *Phares* v. *Barbour,* 49 id. 370; *Warrick* v. *Hull,* 102 id. 280; *Treleaven* v. *Dixon,* 119 id. 548; *Keep* v. *Gregg,* 12 Bradw. 511.

Mr. E. H. GARY, and Messrs. HOPKINS, ALDRICH & THATCHER, for the appellees:

As to the mental capacity necessary to make a deed or will, see 1 Jarman on Wills, 28; Burswell on Insanity, sec. 363; *Delafield* v. *Parish,* 25 N. Y. 22; *Marquis of Winchester's case,* 6 Coke, 23; *Combe's case,* Moore, 759; *Greenwood* v. *Greenwood,* 2 Curt. App. 2; *Marsh* v. *Tyrell,* 2 Hogg, 122; *Clark* v. *Fisher,* 1 Paige, 171; *Jaycox* v. *Jaycox,* 40 Mich. 486; *Campbell* v. *Campbell,* 130 Ill. 466; *Sands* v. *Sands,* 112 id. 225.

As to the presumption in favor of the sufficiency of the evidence to support a decree, see *Bower* v. *Galesburg,* 28 Ill. App. 322; *Calvert* v. *Carpenter,* 96 Ill. 63; *Buchanan* v. *McLennan,* 105 id. 56; *Shevalier* v. *Seager,* 121 id. 564; *Moyer* v. *Swygart,* 125 id. 268; *Hoobler* v. *Hoobler,* 128 id. 645.

As to the competency of a party to the suit, and his wife, see 1 Greenleaf on Evidence, sec. 390; *McClure* v. *Otrich,* 118 Ill. 320; *Shipton* v. *Thornton,* 9 A. & E. 314; *Duel* v. *Fisher,* 4 Dervis, 516; *Campbell* v. *Campbell,* 130 Ill. 466.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

A statement of the origin, nature and object of this litigation will be found in 127 Ill. 528-29. The decree from which this appeal is prosecuted was rendered on a re-trial of the cause at the October term of the court below for the year 1891. The only issue then submitted to the jury was, whether or not John Warne was, at the time of their execution, mentally capable of making the conveyances sought to be set aside. Prior to the trial, Clarissa Blackman, a daughter of Warne and one of the complainants to the bill, died, and her children were made parties in her stead. One of these children and new parties, Dr. F. H. Blackman, and his wife, were allowed to testify on behalf of complainants, over the objection of the defendants. That ruling is the only error complained of as having occurred during the trial before the jury.

The competency of Dr. Blackman is questioned both because he is a party to the action and because he is interested in the result of the suit. When these objections were urged below, complainants' counsel attempted to show by the witness that his mother had so disposed of all her property by will as to leave him no interest whatever in her estate, but they seem to have persisted in continuing him a party complainant to the bill. As such he would unquestionably have been incompetent to testify in his own behalf and that of his co-complainants, at common law, and we are unable to see how it can be maintained that such disability is removed by our statute, unless we ignore section 2 of chapter 51, entitled "Evidence and Depositions." We think both he and his wife were incompetent witnesses on behalf of complainants. Inasmuch, however, as

their disability might be removed, and in our view of the case the bill should be dismissed for want of sufficient evidence to. support it, the testimony of these with that of all the other witnesses in the case has been considered, and given such weight as we think it entitled to, without reference to their present incompetency.

The contention of the complainants below is, that at the time of the execution of the instruments in question John Warne was rendered incapable of transacting the ordinary business affairs of life by the disease of the mind known as *senile dementia,* and the decree of the circuit court sustains that contention. In our opinion the evidence not only fails to support it, but is clearly to the contrary. In reaching this conclusion we do not lose sight of the fact that the jury and the chancellor saw the witnesses and heard them testify, and so were in a better position than we are to weigh their testimony; nor do we ignore the rule that a presumption, for that reason, must be indulged in favor of the decree, which can only be overcome by evidence from which we can say it is clearly wrong. It is not, however, accurate to say, without qualification, as counsel do, "that appellate courts will not reverse the judgments of trial courts when the evidence of the successful party, considered by itself, without contravening evidence, is clearly sufficient to sustain the verdict." Language to that effect can doubtless be found in the opinions of this and other courts, but it is only properly used, if at all, where the evidence is conflicting and would justify a finding either way. The testimony of one witness, standing alone, may be clearly sufficient to authorize a verdict and judgment, but if rendered on that testimony alone, when many others of equal intelligence, truthfulness and opportunity for knowing the facts contradict it, no one will seriously contend that a court of review should not set aside the judgment as being contrary to the evidence. It is also to be borne in mind, though not of controlling importance in this case, that the

effect to be given to the verdict of a jury upon a feigned issue in chancery is very different from that of a verdict at law, or where, as in the contest of a will under our statute, the issue must be submitted to a jury. In cases like this, as was said in *Kimball* v. *Cuddy et al.* 117 Ill. 218: "It must be kept in mind that the burden is upon complainants to prove the allegations of their bill; that they must show such a degree of mental weakness as renders the maker of the deed incapable of understanding and protecting his own interests; that the mere circumstance that the mental powers have been somewhat impaired by age or disease is not insufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his acts, unless, by the undue influence of the grantee, he was unable to exercise his will in that respect,"—citing *Willemin* v. *Dunn et al.* 93 Ill. 511.

The deed, lease and bill of sale in question were executed in the months of June and August, 1882. The evidence relied upon by the complainants to prove that Warne was at that time of unsound mind, is, with the exception of that of Dr. Blackman, the testimony of non-expert witnesses, who give opinions as to his mental condition about that time, based on what they saw of him and conversations had with him. A large number of this class of witnesses was introduced. Some of them describe him as greatly enfeebled by age, repeating the stories and incidents of his early life, telling the same stories over and over in the same conversation, failing to recognize persons with whom he had been familiar, even members of his own family, and a small number of them say he became neglectful of his person and all habits of cleanliness. These are unquestionably symptoms of the disease of the mind with which it is claimed he was afflicted, and some of them are strongly indicative of its presence, but none of them are infallible tests of mental disease in persons of old age,—and to that effect is the expert testimony in this record. Others of these witnesses show little or no opportunity for forming the

opinions they give, and their testimony is of no value. The defendants also introduced many witnesses who testified that in their opinions John Warne was in 1882, and in fact as long as they knew him, a man of sound mind, capable of understanding and comprehending the common business affairs of life. As in the case of the witnesses of complainants, some of these base their opinions on slight observation, and we attach but little importance to their evidence. Others detail business transactions with him, about that time and long afterwards, which clearly show that he must have been of sound mind; and still others, though transacting no business with him, show that they had good opportunities for forming their opinions, and give intelligent reasons for their belief that he had ordinary intelligence and business capacity.

It would be impossible, within the reasonable limits of an opinion, to review the evidence of this class of witnesses, and weigh their testimony *pro* and *con*, nor could any beneficial results be attained by so doing. If the case turned on that class of testimony alone, we would not feel called upon to interfere with the finding below, although even then, in view of the fact that the burden is upon the complainants, the case would not be free from doubt. When, however, we come to consider the evidence of those who were present and testify as to the immediate transactions in question, and of other matters of business growing out of or resulting from them, as well as the expert testimony in the case, the conclusion is irresistible that when he made these conveyances Warne fully understood the nature and effect of the transactions, and was possessed of at least ordinary business intelligence. He was then about eighty-seven years of age, residing on his farm in DuPage county, with his wife, where they had resided for many years, raising a family of two sons and six daughters, all of whom had married and left the home long before that time. John W. Guild, to whom the conveyances were made, was the son of the youngest daughter, and had lived with the

grandparents nearly all his life,—over twenty years. That the grandfather was strongly attached to him is clearly shown. All the witnesses who speak on that subject agree that Warne was a man endowed by nature with strong intellectual powers, of more than ordinary force of character and intelligence, and inclined to be positive in his views. Dr. Blackman says his memory began to fail as early as 1875, and that he was afflicted with the disease in 1876. Some of complainants' witnesses say he was of unsound mind even prior to that time, but most of them speak of him about the time of the execution of these instruments, in 1882.

The first we hear of the transactions out of which this litigation has grown is the sending for James M. Valette, a surveyor and notary public, by Warne, about the 6th of June, 1882. Valette testified that he had resided in the county since 1850, and had known John Warne from 1855 to his death; that at the time mentioned he had a conversation with him at his house on the farm, in which "he said he wished to convey a piece of land to Johnnie;" that he made a survey of the piece under the personal directions of the old gentleman, and gives in detail the conversation that took place between them in reference thereto; that after completing the survey he wrote the description in the deed and read it over to him, and he said it was all right; that the deed was not executed that day because the two sons objected; that he saw no indications of mental incapacity in Warne, and says, "My judgment was, he was competent to transact business and execute those papers; there was a little doubt thrown on my opinion by the objection of the sons;" that he returned on the 7th of July,—the day the deed was acknowledged,—and again had a talk with Warne about the deed, when he told him he wanted to put in ten acres of timber to go with the prairie land, and from what part of his lands he wanted it taken; that he went with him to the timber land, where the witness surveyed off ten acres; that Warne was there watching the measurements;

that he showed the witness the corner-post; "that after the stakes were set to show where it came to, he said it was all right, and we marked a line on the trees * * * and went together to the house, and there I wrote in the ten acres; he was present most of the time; when finished I read it to him and he said it was all right; he and his wife signed it and I acknowledged it." The warranty deed described in the bill being shown him, he said: "This is the deed, and it is my signature to the acknowledgment, and I have no doubt but that Warne understood what he was doing at that time. At that time he understood that he had a farm, its location, and the description of the land; that he had certain timber land, the boundaries of it, how much he wanted to convey by the deed and to whom, and this just as well as anybody, without assistance from any other person." No reason is shown why the evidence of this witness should be discredited, and we are unable to see how any unbiased person can read it without believing that at the date and final execution of the deed of June 6 the grantor was fully competent to make it, and that he did so of his own volition.

Following the first visit spoken of by this witness, and on the 15th of June, the two sons, Taylor and Daniel Warne, and Stephen Hill, A. H. Jones and A. A. Gates, three of the sons-in-law, filed their petition in the county court of DuPage county for the appointment of a conservator for John Warne, in which they represented that he was incapable of properly taking care of his property interests, and prayed that Taylor Warne and Stephen Hill, or some other suitable person or persons, be appointed his conservator. On this petition a summons was issued, returnable on the first day of July following. In the meantime, on the 30th of June, the two sons and Stephen Hill sent a messenger to the city of Aurora for an attorney, as the messenger says, "to go out and make some papers for the old man to execute." He procured Frank M. Annis, who had resided in the county since 1864, practicing his profession, and

who had held the office of judge of the city courts of Elgin and Aurora. He testified to the fact of being called to the residence of Warne to prepare papers, and that he drew up a deed from John Warne and wife to John W. Guild, a trust deed from the same parties to one Murry, as trustee, and a bill of sale from Warne to Guild of personal property. He further testified: "These writings were partly drawn at the house and finished at home or at my office. * * * I had not drawn any papers when I went to the house. Think I had no talk with Warne before drawing the papers. There were other parties who seemed to have charge of the negotiations, and I drew the papers at their suggestion. Henry Stolp and Mr. Brown were there. I don't remember any suggestions from Daniel or Taylor Warne. The writing was done in the kitchen or dining room. I took a notary with me, in case the papers had to be acknowledged. I had a talk alone with Warne about executing the papers, for the purpose of learning whether he desired to execute the papers, and realized what he was doing and comprehended the business. No one else was present. I can't recall what he said. I remember that he was satisfied with the papers. I either read the papers to him or told him what they were, my object being to see if he understood what was being done and assented to it. I had no doubt but that he comprehended what was being done, and have had no reason to change my mind. I was with him five or ten minutes. He and I withdrew to another room at the time. I had the papers with me as far as written. I gave him to understand their import. I don't remember that he read them. It seemed to me that he comprehended what was sought to be done, what was being done, and what was done. I was not there again. The writings were not completed there that day, but finished at home. My recollection is that the notary returned with them there the next morning. I have no interest in the case, and have never acted as the attorney of Mr. Guild or his wife." He said on cross-examination: "I don't know

8—149 ILL.

that I saw Warne long enough to form a reliable opinion with regard to his ability to transact business and take care of his property rights. Had I known of his inability to recognize his own daughter I think I should adhere to the opinion I have given, as that fact would depend on the length of time before my interview when this state of affairs existed. Know nothing about the disease called *senile dementia.* He seemed to be an old man. The object of my interview was to satisfy myself of his ability to comprehend and understand what was being done and what I had done, and what I did was calculated to draw that information. The details of the several papers I obtained from the several parties who seemed to be adjusting the difficulties. I don't remember of reading to Warne any memoranda that I made there. I had no difficulty in finding out what was wanted. My recollection as to the details is somewhat vague. I don't remember the exact location of the house and rooms, but Warne and I went into another room from where I first saw him. There were a number of people there, but I can not recall who all of them were. There were some inside and some outside of the house. I paid but little attention to who was going or coming." And again on re-direct examination he stated: "I am not at all indefinite with regard to the conclusion I came to regarding Warne's condition. That was the object of my interview with him. He was ordinarily bright and active. Can't say whether he walked with a cane or wore glasses." Not only does this testimony show that, in the opinion of the witness, Warne was, on the 30th of June, 1882, mentally capable of understanding the conveyances he was then asked to execute, but at that time at least a part of the complainants to the present bill were of the same opinion, else they would not have attempted to have him execute them.

The law firm of Gary, Cody & Gary were employed by Warne to defend against the petition for the appointment of a conservator, and appeared for him for that purpose in the county

court on the first day of July. Hiram H. Cody, one of the members of that firm, was sworn as a witness for the defendants. He had lived in the same county with and had known John Warne since the year 1847. · The witness had held the offices of county clerk and county judge in the county, and later that of circuit judge in the circuit of which the county was a part. He says Warne had to do with public affairs, and he met him frequently. He states the fact of the attempt to appoint a conservator for him in 1882, and his employment; that he saw Warne in Wheaton the day of the trial, before it was called. The rest of his evidence is in substance as follows: "Mrs. Warne was there. I had a talk with Warne about the pending matter. He then gave me some papers which he said had been sent to him to execute,—a lease, bill of sale, warranty deed and a trust deed. (Papers shown the witness, marked 'Annis A,' 'B,' 'C' and 'D.') These are the papers. I think Warne said the children had them prepared and sent to him with a request that he execute them. I kept them. He said he would like to take them into court. The proceedings were to appoint a conservator. This petition looks like the one. Judge Barry was prosecuting the petition. Of the parties that filed the petition, Daniel and Taylor Warne and Stephen Hill were there. In the court Barry got up and said he knew very little about the matter,—that he did not feel prepared to go on with it at that time. While he was talking I asked to be allowed to interrupt him a moment, and with these papers in my hand I stated to the court that there must be some mistake; that I held the papers, a bill of sale, lease, warranty deed and trust deed which I understood from Warne had been sent to him by his children to be executed; that Warne was delicate about executing such papers with their affidavit on file stating that he was not fit to do business, and that he would not sign them under the circumstances; that he wanted a trial at once. I said that if these proceedings were not pending, Warne might be willing to make some

arrangement as represented by these papers.    While I was speaking one of the Warne boys whispered to Barry, when he turned to the court and said, 'I am instructed to dismiss this proceeding.'  It was then dismissed.  Then Barry and myself took Warne and wife into a room, and had a long consultation with him.  I tried to make some arrangement mentioned in these papers except the trust deed, but they were much exercised that day, and no result was reached except a promise to meet us again.  I think Warne objected to the trust deed because it was an attempt to settle his estate before he was dead, and put it out of his control.  It was suggested he could make a will if he preferred.  I think Warne said there, that he wanted to give Johnnie a little more land than was mentioned in the deed as drawn, but I would not be positive. Mrs. Warne was there and had considerable to say.  Warne did not talk as much as she did.  I have not, and never had, any doubt or suspicion but that at this time Warne understood what he was doing.  I then had, and now have, an opinion on that subject which I have seen no reason to change.  I next met Warne at Naperville, July 20, 1882.  Mrs. Warne came with him to my house.  We then had a talk about the same papers, and resulted about the same way as at Wheaton. These papers were there.  No objection was made to any of the papers except the warranty deed and trust deed.  He spoke of giving to Johnnie more land than was in the deed, and about getting a survey made of a piece of timber land.  No papers were then executed.  I saw him again on the 27th or 28th of July.  I think Johnnie came with him.  He brought a letter from Judge Gary, written to Johnnie, stating that Warne had been up to see Judge Gary's father.  At this time Warne said he had made up his mind to make a will, and wanted me to draw it.  I spoke to him of the proceedings at Wheaton,— the feeling about it, and that trouble might be made over a will, and that I didn't want him to tell me a single thing that he wanted to put into the will,—that he go home, write a will,

send it to me, and if necessary to put it in form I would write it over and send it to him to copy. He said he would do it, and went away. On the 4th of August he came again, and brought a will. (Paper shown witness.) This is the will he brought. It is in his handwriting. I don't think that Mrs. Warne came with him. I had a talk with him about the will in my office. I saw he had given a reason here for making a difference in the amount of property given his children, and suggested to him that it was better to give no reason,—that he was not obliged to, even if he felt that way. He agreed with me, and said that could be left out. I refer to the clause where he said they had disgraced him and tried to make him out an idiot. I read this draft aloud, and talked as I went along. He put my name in as executor. I told him I didn't want to serve, but he said I must. I said, 'If you insist, put Johnnie in with me.' He said all right. I also suggested that he fix a time for paying the legacies. I told him I would draw it over and send it to him by mail, and he could copy it. I drew the will, mailed it to him August 7, and sent legal paper to copy it on if he desired. This is the will I sent him. I saw him again on August 10, 1882. He came to my office to execute this will. He produced it, and I said, 'You have not copied it.' He said, 'No; it looks nice; I am satisfied with it; leave it just as it is.' I am not certain whether his wife came with him that day or not. Johnnie drove him to the house and left him. I either went or sent for Daniels, Skinner and Scott to come to my office. They came, and I told them the purpose for which I wanted them, which was to witness a will for Warne,—that proceedings had been commenced questioning his mental capacity, and to satisfy themselves if he was competent to make a will. They sat and talked with Warne a considerable time. The will was executed in their presence. They, a man named Lundy, reading law in my office, and myself, signed as witnesses. Lundy was well acquainted with Warne; and has since died. I think the will

was read over.   The witnesses signed it in the presence of
Warne.   The will was left with me.   It was signed by him that
day in the presence of the witnesses and myself.   That is his
signature.   I think the will remained with me until the first
trial of this case.   The will in Warne's handwriting I retained.
After the will had been executed the bill of sale and lease were
executed;.   These are the papers, marked 'Annis C' and 'E.'
They are in the handwriting of Judge Annis, except interlin-
eations made by me before they were executed.    *    *    *
Warne and Guild signed this lease in my presence.   The same
was handed to me by Warne at Wheaton as having been drawn
at the instance of his sons for him to execute.   When Warne
was at my office in reference to this will, in my judgment he
was mentally competent to do the business in hand, and un-
derstood perfectly what he was about; also at the time of the
execution by him of this lease and bill of sale.   I then con-
sidered him mentally sound, and the best preserved man,
mentally and physically, that I ever saw in my life at his age.
At the time these papers were signed I told him it would be
a good plan for me to come to his house, and for him to re-
publish the will before some of his near neighbors, as it might
be noticed that it had been executed away from home.   I then
made an agreement with him to have it done.   The bill of
sale and lease were read over to the old gentleman, and they
were left with me for safe keeping.   They, with the will, were
put in the safe at Naperville and afterward taken to Chicago,
and remained in my possession until the trial at Wheaton.
*    *    *    On the 6th. day of January, 1883, I went up to
Warne's house for the purpose of re-publishing his will.
James A. Blair, Charles Stolp and Henry C. Balis were there.
These gentlemen were sent for at my request, as the nearest
neighbors who knew Warne best.   I only remember these
three parties and Warne and myself as being present.   I ex-
plained to these gentlemen that they were sent for as witnesses
to a re-publication of Warne's will because they were near

neighbors, if they were satisfied in their own minds that he was perfectly competent to make a will. I then wrote the acknowledgment signed by Warne in our presence, and we signed it then as witnesses. I can not state that the will was read there that day. I know Warne had it in his hand looking it over. I then considered him of sound mind and memory, and competent to transact that business. I have no doubt about it. I think I took the will back with me to Naperville. At the conservator proceedings with Warne, in connection with my partners, we were acting as his legal advisors." This witness was cross-examined at great length by counsel for the complainants, but his cross-examination elicited no material fact not stated in his examination in chief, and wholly failed to in any way discredit him.

The draft of a will made by Warne in his own handwriting, spoken of by Judge Cody, appears in the record, and it bears upon its face the indubitable evidence of intelligence in the writer, and shows that he comprehended the scope and effect of the matter in hand. The will executed August 10, the day the lease and bill of sale were executed, witnessed by L. M. Skinner, H. C. Daniels, William Scott, Jr., Hiram H. Cody and N. A. Lundy, was also offered in evidence by the defendants, and the living witnesses thereto, Skinner, Daniels, Scott and Cody, all testified that at the time of its execution Warne was of sound mind and fully understood what he was doing; that he was at the time, in their opinions, fully capable of transacting the ordinary business affairs of life, and they each state facts sustaining that opinion. Also, the witnesses to the re-publication of the same will January 6, 1883, James A. Blair, Henry C. Balis and Cody, express the positive belief that he then fully understood and comprehended the scope and effect of the will, and understood the common affairs of life, —in other words, that he was then competent to transact business. The witness Balis gives an account of a business transaction between himself and Warne in October, 1882,

concerning a promissory note, in which Warne, unaided, calculated the interest upon a note with several partial payments, and wrote a new note for the balance due, making no mistakes. A lease written by him in November of the same year, by which John W. Guild let certain lands for one year from the first day of March, 1883, was introduced, which clearly shows that the writer fully comprehended and understood that business transaction. Photographic copies of this lease, the draft of the will above referred to, and of a promissory note written by him in October, 1887, are before us, and it seems impossible that they could have been written, to say nothing of the composition, by a person void of mental capacity, especially one afflicted with *senile dementia* to the extent of being incapable of transacting ordinary business.

Counsel for complainants seem to think these instruments were written mechanically, at the dictation of others, and they insist that theory is supported by the fact that one of them (the promissory note) was made after Warne was confessedly imbecile. Independent of the fact that a conservator had been appointed for him the previous February, the evidence in this record is no more convincing of his being insane in October, 1887, than it is that he was so in June and August, 1882. But even if we could believe the act of writing the note to have been performed mechanically and without intelligence, still it would not follow that the same should be said of the other papers. The note is in a short and very simple form, and the evidence shows that it was dictated. The drafting of the will and lease as they were written required powers of reasoning, memory, and continuity of thought. Dr. Patterson, who has had many years of experience in an insane hospital and in the treatment of diseases of the mind, speaking of the will, says: "I think a person who wrote that could not be afflicted with *senile dementia* to the extent of not understanding, as the composition, the penmanship, the positive expression of likes and dislikes, show will power. The dis-

ease ordinarily effaces the will power. I don't think the man who wrote it was affected with *senile dementia.* The paper indicates sufficient mental capacity to understand what he was about." Speaking of the lease he says: "This contains a statement of facts and dates, refers to the number of acres of land, the rent being payable one-half in six months and the other half at another time, mentions road taxes, firewood, makes a distinction between maple and hickory wood, and that the rent must be paid, etc. It compels me to say that I don't believe he was in that state of *dementia* which made it impossible to do fairly and understandingly what he did. If he drew that lease, in my opinion he was of sufficient mental capacity to understand what he was about when it was done." To the same effect is the testimony of Dr. Wescott, who had been an assistant in the Kankakee insane hospital for over two years.

Dr. Blackman, the only expert witness introduced by complainants, said on cross-examination, speaking of the draft of the will: "I should say a person who wrote and composed that did not have *senile dementia* to the extent of not knowing what he was doing." When shown the lease he also said: "It is grandfather's handwriting, except the pencil writing. I should think the person who wrote that was in pretty fair mind." He evidently believed, as counsel for the complainants insist, and as is alleged in the bill, that these writings were dictated by John W. Guild, Mrs. Warne or other persons, but the proof does not sustain that contention. There is neither evidence that they were dictated, or that those who were present at the time they were written knew how to dictate them. It is conceded that Dr. Blackman swears positively that at the time of the execution of these papers his grandfather was so far afflicted with *dementia* as to be mentally incapable of understanding the business in hand and incapable of transacting any ordinary business. He does not, however, claim to have had any considerable experience in

the treatment of or observation as to mental diseases, and it is manifest, from his entire testimony, that his opinion as an expert is largely the result of special reading with reference to this case. In fact, he in substance so states. His testimony is not only greatly weakened by the admissions above referred to, but by the fact that Warne lived much longer after he says the disease first manifested itself than is usual, if it be possible. He dates the disease from 1875 or 1876, Warne then being about eighty years old. He died in July, 1888, living eleven or twelve years after the attack, according to the testimony of this witness, and much longer if others are correct in their statements as to the first manifestations of the disease. Dr. Blackman admits that with persons past eighty years of age in a large number of cases death is produced in from four to five years. He says: "I remember one case extended to eight or nine years. The man was not past eighty at the time. In my experience I don't know of a case where it lasted five or six years in a man past eighty. Can't tell of any case I have read of, without looking it up. Mental and physical weakness in old age go together. That is the rule as laid down in the books." He thinks he has read of cases in which the patient lived ten or twelve years, but is not definite in his recollection, and his evidence on the subject is to the effect that if such a case existed in a person eighty years old when attacked, it would be a rare exception to the general rule. Dr. Patterson says: "I don't know of a person afflicted with *senile dementia*, past eighty, living eleven or twelve years, and with my knowledge, experience and judgment I do not think a person so afflicted could. If at eighty-seven years of age he was bright and active and smart on his feet, I do not think he could have been afflicted for six or seven years with *senile dementia*."

Whether if John W. Guild had outlived his grandfather a conservator would ever have been appointed for the old gentleman and this litigation put upon foot can not be known,

but it must be admitted that the conduct of these complainants has not been wholly consistent with the belief that John Warne was a mental imbecile in 1882. If they, in fact, believed what they now allege in their bill, and what a portion of them set forth in their petition of the 15th of June, 1882, as to his mental condition when he conveyed a portion of his property to John W. Guild, it was an act of injustice to both their father and Guild that they should have postponed their efforts to have the matter investigated for more than four years, and until after the death of one of the parties, and the other had become less capable of defending himself against a charge which he felt in 1882 a great humiliation. But without reference to this unusual course of conduct, if, on the evidence in this record, these instruments can be declared void on the ground that the maker of them was mentally incapable of legally executing them, similar transactions by aged people can never be upheld if a change in family relations or other circumstances renders it desirable for either party himself, or his heirs, to avoid them.

As before stated, the issue of undue influence was not submitted to the jury upon the last trial, nor is the decree based upon that allegation of the bill, but on the sole ground that John Warne was, when he made these conveyances, of unsound mind. We have, however, carefully examined the record for evidence tending to support the allegation that John W. Guild and his grandmother brought about the transactions through undue influence, and find no substantial proof of the charge.

The decree of the circuit court will be reversed, and the cause will be remanded to that court with directions to dismiss the bill.

*Decree reversed.*